CANADY, J.,
dissenting.
Because I conclude that the decision on review, Franks v. Bowers, 62 So.3d 16 (Fla. 1st DCA 2011), does not expressly and directly conflict with University of Miami v. Echarte, 618 So.2d 189 (Fla.1993), I would dismiss this case for lack of jurisdiction under article V, section 3(b)(3), of the Florida Constitution. On the mer *1254 its, I conclude that there is no statutory basis for determining that the provisions of the Financial Agreement limiting non-economic damages violate public policy. On the contrary, it is the judicial invalidation of the Financial Agreement that is at odds with the public policy established by the Legislature.
I. Jurisdiction
In Franks, the First District Court of Appeal considered whether a Financial Agreement between a patient and his doctor that provided for mandatory arbitration was contrary to public policy. After explaining that the voluntary arbitration provisions of chapter 766, Florida Statutes, “were enacted in response to a dramatic increase in the cost of medical malpractice insurance,” the First District concluded that the mandatory arbitration portion of the Financial Agreement did “not countermand the public policy reflected in Chapter 766, as applied to the claims presented in this case.” Franks, 62 So.3d at 18. The First District reasoned that the Financial Agreement could be enforced because it did “not eliminate statutory rights which are essential in effectuating legislative intent” but instead “affordfed] meaningful relief’ that was “consistent with the legislative purpose and the public policy which led to the enactment of the medical negligence provisions in Chapter 766.” Franks, 62 So.3d at 18.
Echarte involved a distinct legal issue. In Echarte, this Court rejected several challenges to sections 766.207 and 766.209, Florida Statutes (Supp.1988) — which provided for voluntary arbitration and a non-economic damages cap in medical malpractice claims — but “limit[ed][its] discussion to the validity of the statutes under the right of access to the courts.” 618 So.2d at 191. In its opinion, this Court considered only whether the voluntary arbitration and noneconomic damages provisions of sections 766.207 and 766.209 satisfied the access-to-courts test set out in Kluger v. White, 281 So.2d 1 (Fla.1973), and concluded that the statutes provided a commensurate benefit for the loss of the right to fully recover noneconomic damages and, alternatively, that the Legislature’s tort reform was justified by an “overpowering public necessity,” for which “no alternative method of meeting such public necessity [was] shown.” Echarte, 618 So.2d at 195 (quoting Kluger, 281 So.2d at 4).
The legal issue addressed in Echarte was whether the Legislature could constitutionally alter or abolish a preexisting right of redress for a particular injury— not whether an individual could contract out of the statutory procedures enacted in chapter 766. This Court reviewed the constitutionality of a legislative solution to a public problem. This Court was not asked, however, to consider the public policy implications of individual patients and doctors privately negotiating stricter arbitration agreements on a ease-by-case basis.
A discussion of how the majority believes that Franks and Echarte conflict— and its resolution of that “conflict” — is noticeably absent from the majority opinion. Because Franks and Echarte address different legal issues, this Court does not have jurisdiction, and the case should be discharged. Accordingly, I dissent.
II. Merits
On the merits, I disagree with the majority’s conclusion “that the Financial Agreement blatantly contravenes the intent provided by the Florida Legislature” in the Medical Malpractice Act (MMA). Majority op. at 1247. The Financial Agreement undeniably furthers the general purpose articulated by the Legislature in the text of the statute. It is the majority’s decision that “blatantly contravenes” the legislative purpose not only of the *1255 MMA but also of the Florida Arbitration Code, §§ 682.01-22, Fla. Stat. (2012).
The statute at issue here is expressly designed to limit the expense associated with medical malpractice litigation. In the statutory declaration of legislative findings and intent, the Legislature made the following salient findings:
(a) Medical malpractice liability insurance premiums have increased dramatically in recent years, resulting in increased medical care costs for most patients and functional unavailability of malpractice insurance for some physicians.
(b) The primary cause of increased medical malpractice liability insurance premiums has been the substantial increase in loss payments to claimants caused by tremendous increases in the amounts of paid claims.
(c) The average cost of a medical negligence claim has escalated in the past decade to the point where it has become imperative to control such cost in the interests of the public need for quality medical services.
(d) The high cost of medical negligence claims in the state can be substantially alleviated by requiring early determination of the merit of claims, by providing for early arbitration of claims, thereby reducing delay and attorney’s fees, and by imposing reasonable limitations on damages, while preserving the right of either party to have its case heard by a jury.
§ 766.201(1)(a)-(d), Fla. Stat. (2012) (emphasis added).
By the enactment of the statute, the Legislature sought to address the mischief of the perceived excessive “loss payments to claimants caused by tremendous increases in the amounts of paid claims.” § 766.201(1)(b), Fla. Stat. (2012). To help remedy this mischief, the Legislature enacted measures to provide post-dispute incentives for arbitration and to prevent the filing of frivolous claims and defenses. Among the post-dispute incentives for arbitration was the provision for the conditional limitation on noneconomic damages whenever the defendant concedes liability. Nothing in the statute, however, prohibits voluntary pre-dispute agreements — outside the statutory framework — to arbitrate disputes or to impose limits on damages.[2]
The majority reasons that “the concession of liability is one of the incentives provided by” the statute and that the “avoidance of the incentive contravenes the intent of the statute.” Majority op. at 1248. The majority thus concludes that the pre-dispute Financial Agreement contravenes the statute because the Financial Agreement does not contain a concession of liability. This is incongruous. A post-dispute concession of liability may be a very reasonable “incentive,” but a pre-dispute concession of liability would be absurd. It is wholly unjustified to extrapolate from the post-dispute context addressed by the statute to impose restrictions in the dissimilar context of voluntary pre-dispute agreements.
Nothing in the statute can be read to support the conclusion that the purpose of the statute is thwarted by voluntary pre-dispute agreements — such as the voluntary agreement invalidated by the majority here — designed to limit the cost of litigation and the amount of paid claims. Instead, such voluntary agreements are designed to cure the same mischief that the statute seeks to address. The Financial *1256-1258 Agreement here unquestionably serves to advance the public policy embodied in the statute. The specific public policy of the MMA thus is antithetical to the majority’s decision. And the majority fails to cite any authority for a general public policy— either legislatively established or judicially recognized — prohibiting voluntary agreements limiting liability.
There is an astonishing irony in the line of judicial reasoning that condemns as invalid a voluntary agreement designed to limit the expense of medical malpractice litigation and grounds that condemnation on the purpose of a statute expressly designed to limit the expense of medical malpractice litigation. The public policy that animates the Court’s decision here is an unprecedented judicial policy that contravenes the declared objective of the Legislature set forth in section 766.201.
The majority’s decision also contravenes the public policy embodied in the Florida Arbitration Code, which provides as follows:
Two or more parties may agree in writing to submit to arbitration any controversy existing between them at the time of the agreement, or they may include in a written contract a provision for the settlement by arbitration of any controversy thereafter arising between them relating to such contract with the failure or refusal to perform the whole or any part thereof.
§ 682.02, Fla. Stat. (2012) (emphasis added). This broadly framed statutory right to enter both pre-dispute and post-dispute arbitration agreements is set aside by the majority’s decision on grounds that cannot withstand analysis.
In the name of public policy, the majority thus strikes two blows against the public policy unambiguously established by the Florida Legislature. This decision validates the old observation that “public policy” is “a very unruly horse.” Story v. First Nat’l Bank & Trust Co., 115 Fla. 436, 156 So. 101, 103 (1934) (citing Richardson v. Mellish, [1824] 130 Eng. Rep. 294, 303, 2 Bing. 229, 252). Here, public policy has kicked over the traces.
POLSTON, C.J. concurs.

. For that matter' — although the point is not at issue here and may be of no practical importance — nothing in the statute prohibits parties from entering voluntary post-dispute agreements to arbitrate or limit damages.